# UNITED STATES DISTRICT COURT

## for the

## Northern District of Georgia

## Atlanta Division

| | | |
|---|---|---|
| Kenneth Harris | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. |
| | ) | JURY TRIAL DEMANDED |
| Lennox Inc | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Kenneth Harris ("Harris") and hereby submits this Complaint showing the Court as follows:

## PRELIMINARY STATEMENT

This is a case arising out of the Defendant's employment discrimination and retaliation against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq ("Title VII")

## JURISDICTION AND VENUE

1.   Plaintiff's claims present federal questions over which the Court has Jurisdiction pursuant to 28 U.S.C. §1331, §1334(a) and 42 U.S.C. §2000e-5(f)(3).

1

2.     Venue is proper pursuant to   28 U.S.C. §2000e-5(f)(3) and pursuant to 28 U.S.C. §1391(b) and (c) as every act of which the Plaintiff complains occurred in the Atlanta Division of the United States District Court for the Northern District of Georgia.

3.     Plaintiff is a resident of the State of Georgia and submits himself to the jurisdiction of this court.

4.     The Defendant's business which Harris worked is located in the State of Georgia, specifically Defendant was conducting some of its business in the Atlanta Division of the United States District Court for the Northern District of Georgia.


## STATEMENT OF FACTS

5.     Plaintiff Kenneth Harris ("Harris") began working for Lennox as a HVACLS Technical Trainer ("HVACLS Trainer") in July of 2014.  As an HVACLS Trainer, Harris' job was composed of two main tasks: teaching classes which served to train contractors on Lennox equipment and Teaching contractor customers how to become an HVACR technician. As HVACLS Trainer, Harris was also charged with setting up the HVACLS training classroom and lab, at Lennox's Norcross GA offices (the "Project").

6.     A few days after beginning the Project, Harris noticed that there wasn't a place to store the tools and equipment that Harris was using (the "Equipment").

7.     As a result, Harris asked his manager Mr. Jose De La Portilla, a non-black male, if Harris could store the tools and other equipment in an off-site storage facility.

8.     Mr. De La Portilla declined, stating he didn't want to spend the money.  While working on the Project, Harris decided the best place to store the equipment was in the Project workspace.

9.  Mr. De La Portilla saw Harris' solution to the storage problem and never took issue with it.  A few days later, two white male employees from district headquarters toured the Project workspace, while it was still under construction.  The two men saw how Harris was storing the Equipment and didn't like it.

10. The next day, Harris was reprimanded by Mr. De La Portilla for not storing the equipment in a better way.  Harris was puzzled as to why he was now getting reprimanded for an act that Mr. De La Portilla had been aware of for days and had no prior problems with it.

11. Mr. De La Portilla advised that Harris find a separate place to store the Equipment, while the lab was being constructed.  Ultimately, Harris was given storeroom space by the Commercial Retail Manager.

12. After receiving the storeroom space, Harris organized the lab within the guidelines set by Mr. De La Portilla.

13. This was the first time that Lennox management took the side of a non-black employee over Harris'.  This was also the first instance where Harris received no support from management while doing his job.

14. Following this incident, Harris noticed Mr. De La Portilla became socially distant.

15. Prior to Harris' first reprimand, Harris considered Mr. De La Portialla a friend.  Mr. De La Portilla would often ask about Harris' sick wife; he even took Harris wife and he to dinner, in the first months of my employ with HVACLS.

16. On or around March 2015, Tom Mallinos a Canadian citizen, illegally came to the United States to teach a class.  Mr. Harris believes that Mr. Mallinos was flying from Toronto to Boston.

17. When Mr. Mallinos got to the United States, he was detained by customs and was sent back to Canada.  Mr. Mallinos contacted headquarters in Dallas informing them that he wouldn't be able to teach his class, the next morning.

18. An alternate manager, Dave Nichols then called Harris while he was in Charlotte, stating that Harris would need to fly to Boston to teach Mr. Mallinos' class because Mr. Mallinos wasn't able to gain entry to the country.

19. Harris asked what would be done about the class that he was to teach in Charlotte the next day and Harris was told that Mike Fisher would cover the class.  Harris left for Boston that evening.

20. The next morning, Harris woke up and went to his class.  Lennox's Headquarters thought a smaller number of students would be in attendance than were present.  Headquarters the shipped supporting training materials (the "Materials") based on a fewer number of students than who actually attended.

21. Harris was forced to postpone the start of the HVACLS class to secure additional Materials for the students.  Once each student received the Materials, Harris began his class as normal, and everything went on smoothly all three days.

22. After the class was over, a white student complained that the class didn't start on time. The same student told management that Harris was not prepared to teach his class.

23. Without asking what Harris' side of the story, Mr. De La Portilla warned Harris never tell a student that he was unprepared to teach a class.  Mr. De La Portilla then sent an email to the entire department advising that other instructors not do the same.

24. Harris explained to Mr. De La Portilla that it wasn't that he was unprepared to teach the class, Harris simply didn't have the correct number of Materials, for the students in attendance.

25. While Harris readily admits that he didn't have enough Materials to teach the Boston class; Harris contends that having a shortage of Materials, was not his fault.  It would have been impossible for Harris to know the quantity of Materials he needed for a class he was never scheduled to teach.

26. Mr. De La Portilla seemed indifferent to Mr. Harris' explanation, taking the side of the white customer without question.  Mr. De La Portilla took the side of a white male, without considering Harris' recollection of events.

27. On Monday December 12, 2016 Harris' department began a meeting in Richardson, Texas for all HVACLS department members.

28. During this week of meetings with Harris' team, several things occurred that were inappropriate, sexist, homophobic, and racist.

29. The HVACLS Technical Training team consisted of myself and the following additional persons:  Ramy Mousa, Kenneth Rawlins, Dustin Evans, David Gray, and Jose De La Portilla.

30. On Tuesday, December 13th, 2016 after picking up lunch with David Gray and Dustin Evans in the cafeteria, the three of us went to the elevator to return to the 2nd floor and continue creating the "HOW TO" videos[1].

---

[1] The How To videos were productions that were created by the Lennox HVACLS team to teach customers how to perform certain HVAC tasks.

31. While the men were waiting for the elevator to appear, a young lady entered the cafeteria and Mr. Evans immediately started gawking and in hear shot of the woman, commenting about her looks stating: "look at that" and Mr. Gray replied "that's nice".

32. Mr. Evans then made the statement "Sam (the camera man) isn't looking at his phone he is checking her out," as the young lady passed near Sam to place her order.

33. Both individuals felt comfortable making these comments about the young lady while at a corporate meeting. Harris remained silent as the men.

34. This wasn't the first time that Mr. Evans had made inappropriate sexist remarks about women.  One specific occasion, Harris had to explain to Mr. Evans that it is inappropriate to comment on women's looks, or to call them "honey" or "hun" in the workplace.  Mr. Evans responded that he didn't see anything wrong with those types of comments.

35. During their conversation, Mike Moore, director of HVACLS, informed Mr. Evans that this was inappropriate behavior, but never said anything more.  Mr. Evans also tended to burp and pass gas as loudly as possible during company meetings.  David Gray has been present in the room when Dustin has begun burping and passing gas obnoxiously.

36. On Wednesday December 14th 2016, the Build-A-Technician graduation dinner took place and Sam (the camera man) took a picture of Dustin Evans rubbing Ramy Mousa's behind.

37. This picture was passed around to several team members and they began commenting on Mr. Mousa's facial expression when Mr. Evans began rubbing Mr. Mousa.

38. One of the comments was "he looks like he likes that."  Mr. Mousa replied "no I don't like that", and they all laughed.  Again, Mr. De La Portilla was present and said nothing.

6

39. On Thursday, December 15th, 2016 prior to continuing to make the "How To" videos, Dustin Evans began playing music which repeatedly chanted the word "nigger", "nigger" over and over.

40. Sam (the camera man), Mr. De La Portilla, Mr. Gray and Harris were present.  Sam, Mr. De La Portilla and Mr. Gray were all close together and Harris was about 20 feet from where they were standing when the degrading music began to play.

41. Mr. De La Portilla, the manager, said nothing to Mr. Evans.  This type of music, which uses racially charged language should not be played in any work environment.

42. That afternoon, Mr. Evans went to the bathroom and approximately 30 to 40 seconds later Mr. Mousa indicated to the group that he was going to the bathroom.

43. In response, Mr. Gray immediately made a stereotypically sexist remark stating "girls usually go to the bathroom together."

44. Everyone except Harris laughed. When Mr. Evans returned from the bathroom, Mr. De La Portilla told him what Mr. Gray said and all of the men laughed. Harris remained silent.

45. On Friday, December 16th, 2016 while reviewing a Lennox power point presentation, Mr. Gray and Harris were discussing corrections that needed to be made.

46. The discussion got heated when Mr. Gray referred to Harris as "Boy".  This was the second time, on that particular day, that Mr. Gray had referred to me as "Boy" so Harris was confident that it was not a simple miscommunication.

47. Harris immediately told Mr. Gray never to refer to him as "Boy" again.  Harris further advised that Mr. Gray refer to him by his name, Ken.  To Harris' knowledge, Mr. Gray, a white

male, has never referred to any of the other white team members as "Boy".  Mr. De La Portilla was present and heard Mr. Gray refer to me as "boy" and said nothing.

48. Harris attempted to explained to Mr. Gray that there were racial undertones associated with the use of the term "boy" to describe a black male.  Mr. Gray was indifferent, never offering an apology.

49. On Friday, December 16th, 2016 Harris told Mr. De La Portilla that he needed to speak to De La Portilla about the behavior Harris had observed from the HVACLS staff at the meeting that week.

50. Mr. De La Portilla responded, telling Harris that he didn't have time to speak with him because Mr. De La Portilla had to leave and do something "very important."

51. However, Mr. De La Portilla did not leave, as he had indicated to Harris that he would. Mr. De La Portilla hung around and continued to talk with the rest of the HVACLS team; never addressing Harris' concerns.

52. Following the interaction with Mr. Gray, Mr. De La Portilla asked that I cancel my trip to Dallas for the next team meeting starting on December, 19th 2016.  All other team members, white males, were allowed to attend.

53. Harris believes that this was in retaliation against for standing up to Mr. Gray during a racially charged situation described above.

54.  After noticing that Mr. De La Portilla essentially blew Harris off, Harris left the meeting. On Monday December 19th 2016, Harris sent a letter to Laura Edney in Human Resources (the "HR Letter") describing the racist, homophobic, and sexist behavior he had observed from the HVACLS team prior that week.

55. Harris never received a response from Human Resources, directly. However, an email responding to the HR Letter was sent to Harris by Mr. De La Portilla on January 3rd 2017.

56. In his letter, Mr. De La Portilla suggested that the HVACLS department "needed to be more process driven and that the department would undergo sensitivity training."

57. Mr. De La Portilla, at no time mentioned the HR Letter directly and the sensitivity training the Mr. De La Portilla mentioned never took place.

58. Subsequently Mr. Harris began receiving bad reviews of his work by Mr. De La Portilla

59. Soon after, Mr. De La Portilla wrote Harris up for having an overcrowded storeroom (the "Write-Up").  Harris had never been warned about the state of his storeroom and was completely caught off guard.[2]

60. It was clear that the Write-up was done in retaliation for sending the Human Resources Letter. After being written-up, Harris reorganized his storeroom to align with Mr. De La Portilla's request.

61. A few months later, a white contract employee, Gene Goff, was sent to Columbus Ohio to help another white male HVACLS trainer, Dave Harrell, teach an HVACLS training class.

62. While there, Mr. Goff observed that another HVACLS member, Mr. Harrell's storeroom was in complete disarray.

63. On or around May 18th 2018, Lennox sent Mr. George Clayton ("Geno") to Columbus to reorganize Dave Harrell's lab.  Geno sent pictures to Harris showing how badly Mr. Harrell's workspace was kept.

---

[2] Although Harris' storeroom was overcrowded, the storeroom was out-of-view of the students.

64. Unlike Harris, Mr. Harrell's lab, classroom, and storeroom were each disorganized.  The mess was completely in-view of his students.  However, Mr. Harrell, a white male, was never reprimanded by Mr. De La Portilla, as Harris was.

65. Instead of being reprimanded for the condition of his storeroom Mr. Harrell was given additional resources to organize his workspace. Mr. Harris believes the Write-Up was due to his race and was done in retaliation against Harris for sending the HR Letter.

66. In September of 2017, Mr. De La Portilla asked Harris if he could go to Vancouver to teach a few classes, explaining that a Lennox salesperson in Canada wanted training for his customers.

67. Mr. De La Portilla explained to Harris that he had contacted Gene Goff to see if Goff could go to Vancouver to teach these classes, but he could not.  On September 11th 2017, Harris flew to Vancouver, per Mr. De La Portilla's request.

68. As Harris was passing through customs, he was interrogated for several hours regarding why he was coming to Vancouver.  During the interrogation, it became clear that if Harris had told Canadian Customs that he was there for work, Harris would have been detained longer, if not arrested.  To prevent being detained, Harris had to lie about why he was in Canada.

69. After passing through customs, Harris continued on, teaching the classes that Harris was assigned to teach.

70. Approximately 2 weeks later, Mr. De La Portilla asked if Harris would fly back to Vancouver to teach another class and Harris declined.  Mr. De La Portilla knew that if Harris didn't have a visa Harris could be arrested for entering Canada to work as an instructor.

71. Harris believes Mr. De La Portilla targeted him because of his race, and in retaliation against Harris for the HR Letter.

72. During October of 2018, Harris saw an advertisement for a new position, Commercial Field Technical Consultant ("CFTC").  The advertisement showed that the salary range for the position would be between $80k - $100k per year.

73. Prior to applying for the position, Harris met with Mr. Herb Richardson the Commercial District Manager to find out what salary Richardson believed Lennox would transfer Harris to the CFTC Department at.

74. Without hesitation, Mr. Richardson told Harris that Lennox would only bring Harris over to the CFTC department at Harris' current salary.  In response, Harris asked why the advertisement cited a salary range between $80k and $100k if Harris would certainly be moved over at his current salary?  Mr. Richardson's response was simply "I don't know."

75. Later that day, Harris went back to the Lennox website where the job had originally been posted, in an attempt to take screenshots of the advertised salary range to show Mr. Richardson.

76. Visiting the portion of the site where the job was posted, Harris noticed that the description of the job was still visible, but the salary range had been completely removed.

77. Despite the former, Harris still applied for the CFTC job because it came with a company vehicle and Harris would not lose any money, as he would be transferring into the CFTC department with the same salary while working in the HVACLS division.

78. Harris was offered the CFTC job in December of 2018 and was, again, told that he would move departments at his same salary.

79. On or around December 19th 2018 Mr. Richardson called Harris to his office and was very emphatic that Harris sign some employment documents on the spot, saying "he had to get them back to Human Resources."

80. Mr. Richardson assured Harris that the terms in the document were identical to the terms that Harris and Richardson had discussed regarding Harris' salary, prior.  Operating under this assumption, Harris signed the documents (the "Employment Documents").

81. On or around January 7th 2019, Harris met with Mr. Richardson to go over Harris' yearly objectives.  During this meeting, Harris discovered that as a CFTC, there would be additional requirements imposed on Harris that were never discussed in his interview or at any point with Harris prior to signing the Employment Documents.

82. According to Mr. Richardson, Harris would now be required to teach 675 training hours each year; whereas Harris had no training requirements in HVACLS.

83. Additionally, 90% of Harris' salary was to be distributed equally over the course of the 2019 calendar year, as normal.

84. Nine percent ( 9%) of Harris' compensation would be tied to the completion of Harris' yearly training hours, and the remaining 1% would be tied to some other metric.

85. In this conversation, Harris also discovered that Mr. Richardson and Dave Nichols (then the HVACLS District Manager) agreed that Harris would also conduct training courses for the HVACLS Department in the months of January, February, and March of 2019, in addition to Harris'  other duties.

86. While teaching the extra classes were not a problem; Mr. Richardson was not willing to credit the total hours that Harris taught for the both the HVACLS and CFTC divisions, toward the 9% of Harris' salary tied up in the 675 hour training requirement.

87. In sum, Harris was shocked to learn that his new post with CFTC would entail more detailed work, for less pay.   Had Harris known this prior, Harris would have never taken the position and would have stayed in the HVACLS department.

88. However, Harris had already left his post with HVACLS so if Harris didn't comply, Harris would have had to quit or Harris would've been fired.

89. Quitting the CFTC job was not viable option for Harris, as Harris had a terminally ill wife he was caring for, at the time.

90. When Harris began work in January, but before he started his first HVACLS training, Harris wanted to clarify how many hours he would receive, toward his performance based salary, for teaching HVACLS Division courses.

91. Mr. Richardson replied that he wasn't sure and would look into it.

92. Harris responded confirming the hours he had worked.  As of March 28th Harris had completed a total of 272 HVACLS training hours.  Of the 272 HVACLS training hours conducted, Harris only claimed 144 HVACLS training hours.

93. Harris submitted those hours to Mr. Richardson for credit toward Harris' salary.  After submitting his HVACLS training hours, Harris asked Mr. Richardson again whether he would receive credit toward his salary for the HVACLS training hours that he had submitted.

94. Mr. Richardson stated "that will [be] over half of your total hours.  I am comfortable with 80 hours, as if you were here.  Think that would be about what you could do, but much more than that, gets a little heavy for me."

95. Mr. Richardson was essentially renegotiating the terms of Harris' employment contract, by giving Harris credit fewer training hours than Harris had worked.

96. Harris further explained that it was unfair that he would have to work 272 HVACLS training hours and would only receiving credit for 80 of those hours.  Mr. Richardson went on to say 80 hours is more than fair.

97. On March 29th 2019 Mr. Richardson emailed Harris that he had just had a talk with Jeff Hartnett (Mr. Richardson's boss) and that he and Mr. Hartnett needed to meet to "put this hours business to bed".

98. Mr. Richardson went on to say, the training goal is also based on how well Mr. Harris work with the members of his team, and that all parties in the CFTC department are required to and enlist commercially oriented training courses from our customers.

99. Essentially Mr. Richardson was saying that although Harris was completing all of his training hours at Lennox, only the CFTC hours that Harris taught would count toward Harris' salary.

100.        Due to the foremer, Harris was essentially working most of his HVACLS training hours for free.  Mr. Richardson then stated, "Lets go with 40 hours", dropping the original 80 hours to 40 hours.  Mr. Richardson then stated "I got Jeff [Harnett] to ok it."  Harris was horrified but couldn't do anything because he had already spent the first three months at at his post with CFTC, teaching in the HVACLS department.

14

101.     Harris had the remaining 9 months to catch-up on the 635 hours Harris was required to teach in order to get his full salary.  Harris had no choice but to comply.

102.     On or around May 1st 2019, Lennox sent all of the CFTCs, including Harris, to a safety training class in Ft. Lauderdale FL.

103.     The purpose of the class was to give the CFTCs tips on how to better do their job safely.  The meeting also served to inform the CFTCs of what safety equipment each would need, to be in compliance with OSHA regulations.

104.     Following the safety meeting on May 18th 2019, Harris showed Mr. Richardson the list of required safety equipment.  Mr. Richardson looked at the list and responded that he would buy some of the equipment but not all.

105.     Mr. Richardson then stated that Harris must have misunderstood something at the safety meeting.  Harris responded telling Mr. Richardson that he specifically asked if these items were "required" for CFTCs and Harris was told that these items were requirements were handed down from headquarters.

106.     Harris went on to say that he had been placed in unsafe positions, in the past while providing on-site technical support.  Mr. Richardson seemed indifferent and purchased less than half of the items on the OSHA required safety list.

107.     On or around August 27th, 2019 the commercial salesman Brian Duvall requested that Harris come to Birmingham to meet with himself and a customer, Stewart Perry.  Harris informed Mr. Richardson about the trip and Mr. Richardson told Harris that he would not be permitted to stay overnight because Mr. Richardson wanted to save Lennox money.

108.     However, Mr. Duvall, a white male, was allowed to stay overnight.  Mr. Duvall was travelling from Destin, FL to Birmingham AL.

109.     The distance between Monroe GA and Birmingham AL (Harris' trip) and the distance between Destin Fl and Birmingham Al (Mr. Duvall's trip) are approximately the same.

110.     However, Mr. Richardson had the expectation that, Harris, a black male, drive all day, tired and unrested, while Mr. Duvall, a white male, was allowed to rest comfortably in his hotel room the night before and following the Birmingham meeting.

111.     Harris believe that he was discriminated against, in this situation, based on his race.

112.     During the Summer 2019, Mr. Richardson instructed Harris to go to the residence of a commercial customer to help figure out what was wrong with their personal home air conditioning unit.

113.     Mr. Richardson explained to Harris that he understood this particular task would normally be handled by the HVACLS but noted it would help gain good-will from the customer toward Lennox if Harris complied.

114.     Harris complied going to the residence and troubleshooting the problem with the customer's unit.

115.     Harris determined that the customer's unit was the wrong size for his home and that was why it wasn't cooling properly.  In this situation, Harris was again, being forced to do work for Lennox that he was not being compensated for.

16

116.     Additionally, the goodwill that Lennox received for Harris' work that day, was not credited to him in anyway, even though Harris went above and beyond the call of duty to help satisfy a Lennox customer.

117.     On or around October 2019 Southwest Airlines ("SWA") contacted the Lennox sales team about a unit creating excess vibration, causing their projector to move during presentations.

118.     As a result, the sales team involved Harris to determine the genesis of the vibration.  Harris went to the SWA site and looked at the unit.  From Harris' assessment, the vibration was normal.

119.     Harris then suggested that SWA remount their projector to a more stable support beam.  SWA management didn't like this assessment.  In response, Harris suggested to Mr. Richardson that Lennox send a mechanical engineer from headquarters to assess the SWA vibrations.  Richardson refused/ignored Harris' suggestion.

120.     Eventually, the contractor who initially called customer service hired a specialist to assess the vibration issue.

121.     The specialist came back with vibration numbers and asked Harris if the numbers were within Lennox' specifications.  Harris replied that he would have to check.  Harris then informed Mr. Richardson of this issue and told him that Harris would be contacting headquarters in Dallas to determine what the vibration specification on the fifty (50) ton HVAC unit was.

122.     About a week later, Dallas replied to Harris stating that Lennox does not have vibration specifications for any of their manufactured products.  Based on this information,

Harris recommended that they change out the blower assembly and to add vibration dampers to the new blower assembly.

123.     Manufacturing made the new assembly and shipped it to SWA airlines.  Once the replacement assembly arrived on site, the contractor didn't want to use this option.  He wanted to have the specialist to add bracing to the current blower assembly, and that is what they did.

124.     Harris believes this fixed the problem because Harris never heard from SWA again, regarding the vibration issue.    In this instance, Harris again went above and beyond the call of duty to satisfy one of Lennox's largest customers and received no accolades.

125.     However, other white employees who contributed nominally to Lennox were listed in Chris Drury's Hard Charger Report[3].

126.     On or around January 24th 2020, a Lennox sales person for Schumate, David Dimaulo, contacted me stating that a technician Doug, from a large customer (Schumate), was having an issue with a crankcase heater.

127.     Mr. Dimaulo wanted to know if Harris could help.  Mr. Dimaulo sent Doug's contact information to Harris and Harris called Doug.  Doug explained that he had been working with Jeremy Zimmerman in Dallas to get the correct crankcase heater for the HVAC unit being serviced.

128.     Mr. Zimmerman gave Doug the part number and Doug explained that the crank case heater that he installed had the correct part number but the crankecase heater didn't fit the compressor.

---

[3] A report the Vice President of sales issues each week pointing out employee successes and achievements.

129.     Ultimately, Mr. Zimmerman told Doug that he was in possession of the correct part and gave Doug no further assistance.  After listening to Doug's complaints, Harris told him that he would bring a new crank-case-heater to the site.

130.     Harris was making an attempt to mitigate any bad feelings that Doug had toward Lennox due to his abrasive conversation with Mr. Zimmerman earlier that day.  Harris also relayed Doug's recount of what happened on the phone between he and Mr. Zimmerman to Mr. Richardson and Steve Mersh (Mr. Richardson's VRF counterpart).

131.     Rather than investigate the situation further, Mr. Richardson and Mr. Mersh challenged Harris' knowledge of the conversation.

132.     When Harris met with Doug onsite, Harris noticed that the crankcase heater he brought didn't fit the compressor either.

133.     Harris determined that there was an issue with how the crankcase heater had been cataloged by Lennox.  Harris essentially solved Doug's problem by taking the correct crankcase heater to the site and helping install it.

134.     Following the Schumate problem, Mr. Zimmerman received a tech support person of the year award.

135.     This is another example of Harris going above and beyond to do his job properly but receiving no accolades while similarly situated white employees did.  Harris believes that he was treated this way based on his race and in retaliation against him for sending the HR Letter.

136.     On or around December 1st 2019, Linnie Emmons was conducting a VRF training session for Harris.  During this training session, Ms. Emmons and Harris were discussing a technical topic and Ms. Emmons made a statement that Harris believed to be incorrect.

137.     Before Harris could explain the differences between what he was saying versus what Ms. Emmons was saying, Ms. Emmons blew up.  Ms. Emmons began yelling at Harris saying: "you must think I am dumb and stupid, I am not dumb and stupid, don't talk down to me."

138.     Harris' response was "where is this coming from?  I never said you were dumb or stupid, and I am not talking down to you."  The training session ended and Ms. Emmons gave Harris a date and time for another training session.

139.     Next, Ms. Emmons lied on Harris when she stated that Harris thought she was dumb and that Harris was talking down to her.  However, Harris still planned to attend her next VRF training session.

140.     On or around December 13th 2019, Ms. Emmons and Harris had their second training session.  During the second training session, Ms. Emmons pointed to an air conditioning part on her screen and asked Harris what the part was used for.

141.     Harris explained that the part served to increase the capacity of the HVAC system and Ms. Emmons responded, "no that is not what that is used for" and began to explain her understanding of the part.

142.     Among other things, Ms. Emmons said that the part in question "was used to remove a smaller HVAC system in order to put in a larger HVAC system."

143.     Harris, then stated "you are right and that increases the 'capacity' of the system." Ms. Emmons then responded saying "you are intentionally misunderstanding me and trying to confuse me.  That is just a matter of semantics."

20

144.     Harris explained that he was not intentionally trying to misunderstand or confuse Ms. Emmons.  Harris further explained that he was trying to make sure that his understanding of the VRF material was complete.

145.     Harris went on to state that this was the second time that Ms. Emmons had falsely accused him of doing something that he did not do.  Harris advised, Ms. Emmons, albeit out of frustration, that he would no longer be taking any additional classes from someone who has lied on him on two separate occasions over the past week.  Harris then extricated himself from the situation.

146.     Following their meeting, Ms. Emmons contacted Mr. Richardson telling him that she and Harris had a "spat".  That afternoon, Mr. Richardson called me into his office to ask about the "spat" between Ms. Emmons and me.

147.     Harris explained to Mr. Richardson that Ms. Emmons had now falsely accused him on two separate occasions over the prior two weeks:  The first occasion as previously stated happened on or around December 1st 2019 and the second occasion happened on December 13th 2019.

148.     Harris then told Mr. Richardson that he would prefer not to take any additional classes with this particular white woman.

149.      Harris then explained to Mr. Richardson that there was a history in this country of white women falsely accusing black men and that Harris didn't want to be placed in this particular situation again.

150.     Rather than addressing Harris' concerns, Mr. Richardson told Harris that he went "too far" when he made the former statement.

151.     Harris explained to Mr. Richardson that He would take classes with anyone, white or otherwise, Harris just didn't want to take any additional classes with Ms. Emmons.

152.     Harris went on to explained that when Ms. Emmons takes questions, she wants them asked in a certain way as to not offend her sensibilities.

153.     Harris explained to Mr. Richardson that there has been a history, in the United States of America, of white women falsely accusing black men of all sorts of things.  Harris further explained that he was willing to take a class with any instructor white or otherwise just not with Ms. Emmons.

154.     Mr. Richardson asked Harris, how he would learn VRF, if not from Ms. Emmons. Harris then explained that he is already certified in VRF for Mitsubishi and that he would just need to know the differences between Lennox's and Mitsubishi's specifications.  The meeting ended.

155.     On or around January 9th 2020, Mr. Richardson presented Harris with a document from Human Resources (the " Letter") and requested that Harris sign it.   The Letter alleged that Harris had been observed as being unprofessional over the past year, on multiple occasions, but failed to provide specific instances.

156.     Harris asked Mr. Richardson if he had explained to Human Resources Harris' account of what transpired with Ms. Emmons and Mr. Richardson replied "no".   Mr. Richardson and Human resources reprimanded Harris for what they perceived as bad behavior and simply ignored Ms. Emmons' behavior completely.

157.     In the Letter were a series of "steps" that Harris would be required to take, moving forward, to become more "professional."   Human Resources' steps included Harris

taking classes on "Communicating with Professionalism and Etiquette" and "Being Aware of the Emotions of Others."

158.     Lennox took the side of Ms. Linnie Emmons, a white woman, without considering Harris' account of the events whatsoever.

159.     Harris asked Mr. Richardson that he be allowed to prepare a formal response to the Human Resources Letter that should be included in his employee file.

160.     Harris' letter simply stated Harris' account of the two incidents in which Ms. Linnie Emmons lied on him.  Harris indicated to Mr. Richardson that he would sign the Letter when Harris' letter was completed.

161.     On or around January 10th 2020 Harris completed and emailed his letter to Mr. Richardson. Mr. Richardson never mentioned either of the letters again. Mr. Richardson also never mentioned the sensitivity training again.

162.     Subsequent to my January 10th letter, Mr. Richardson advised Harris that he would have to take additional training courses from Ms. Emmons.  Essentially, Lennox required that Harris be placed back into a racially charged situation despite his discomfort.

163.     Mr. Richardson's explained that he or Mr. Steve Mersh (Ms. Emmons' Manager) would be on the training call to make sure that everything went ok.  Mr. Richardson's statement regarding one of the managers attending the training call seemed to directly implicate that Lennox would be monitoring Harris' behavior, specifically.

164.     During the next training session, Mr. Mersh was in attendance but for less than 10 minutes.

## COUNT 1

23

## DISPARATE TREATMENT AND HOSTILE ENVRIONMENT

165. Harris realleges each fact set forth in paragraphs 1 through 164 of this complaint and incorporates them herein by reference.

166. As an African American, Harris is a member of a protected class. Harris has been the subject of unwelcomed harassment by the Defendant. The harassment involved the Defendant treating Harris differently than his white counterparts. Examples include:

    a. requiring Harris to drive to Alabama from Georgia and then back to Georgia again while another white CFTC was permitted to get a hotel room and spend the night.

    b. Harris was not given credit for helping to resolve many big customers' problems while his white counterparts were.

    c. Harris was disciplined for having an unorganized storeroom whereas his white counterpart's storeroom was much worse but actually received additional resources to help get his storeroom and lab cleaned up.

    d. In racially charged interactions the Defendant almost always sides with the white party as opposed to Harris.

## COUNT 2

## **RETALIATION**

167. Harris realleges each fact set forth in paragraphs 1 through 166 of this complaint and incorporates them herein by reference.

168. Harris engaged in statutorily protected activity by opposing conduct and actions made unlawful under Title VII.  Harris did this by reporting the violations that he had witnessed to his superior Jose De La Portilla. Because Harris' activity was protected, the Defendant retaliated against Harris when his manager removed Harris' name from the next training trip in Dallas, while all of the other white CFTCs were permitted to go.

169. The Defendant retaliated against Harris further by giving him negative reviews as a result of the HR Letter.

170. In sending the HR Letter Harris was participating in statutorily protected activity under Title VII.

171. The defendant consistently retaliated against Harris each time they gave him a negative review or wrote him up.

## **COUNT 3**

## **BREACH OF CONTRACT UNDER GEORGIA LAW**

172. Harris realleges each fact set forth in paragraphs 1 through 171 of this complaint and incorporates them herein by reference.

173. When Harris signed his employment contract it was understood that the Defendant would keep him at his regular salary.

174. The Defendant breached its contract with Harris by tying 10% of his compensation to the number of training classes Harris taught as a CFTC all while not giving Harris credit for all of the HVACLS training classes he was teaching.

## COUNT 4

## VIOLATION OF THE RACKETEERING INFLUENCE CORRUPT ORGANIZATIONS ACT OF GEORGIA O.C.G.A 16-14-4

175. Harris realleges each fact set forth in paragraphs 1 through 174 of this complaint and incorporates them herein by reference.

176. Defendant participated in at least two instances of prohibited conduct.  The prohibited conduct was flying Harris to Vancouver to teach and flying him home.

177.  Additionally each event where Lennox flew Canadians into the United states to work without the proper visas qualifies as prohibited conduct.

178. Lennox participated in this pattern of racketeering in order to save money by not paying for the correct visas for its employees.

**WHEREFORE, Harris Prays:**

(a) That the Court grant Harris declaratory and award compensatory and punitive damages against the Defendants for violating Harris' civil rights to be determined by the enlightened conscience of an impartial Jury;

(b) That the Court award Harris his reasonable costs and attorneys' fees in bringing this action in an amount to be determined at trial;

(c) That Harris be granted a trial by jury on all issues so triable; and

(d) That Harris be such other relief as the Court deems just and proper.

Respectfully submitted this 23rd day of November, 2021.

_____/s/_____

Austin P. Harris
Georgia State Bar: 952049
Attorney for Plaintiff
The Law Office of Austin P. Harris

250 W. Broad St
Suite 102
Athens, GA 30601
Phone (706) 380-4400

27